

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-11-00520-CV

IN THE INTEREST OF A.T.K.,
M.A.C., AND S.A.C., THE
CHILDREN

----------

FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant I.S.S. (Mother) appeals the termination of her parental rights to her children A.T.K. (Adam), M.A.C. (Megan), and S.A.C. (Sarah).[2] We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2] We use aliases for all of the children throughout this opinion. *See* Tex. R. App. P. 9.8(b)(2).

**Background Facts**

At the time of trial, Mother was twenty-two years old, and she had three children. Mother had been in a relationship with R.K. (Royce) until shortly before their son, Adam, was born in April 2007. She later met T.C. (Tony), who is the biological father of Megan, born in June 2009, and Sarah, born in October 2010.

In December 2009, Child Protective Services (CPS) was notified that Tony had assaulted Mother while Adam and Megan were in the house. When interviewed by CPS investigator Robert Gebhardt, Mother stated that she would not see or talk to Tony again, and she had no intention of allowing him to be around the children. From January 2010 until July 2010, Mother attended Friends of Family services for domestic violence victims. Although she told counselors there that she was not in a relationship with Tony any longer, the couple was still seeing each other and Mother eventually became pregnant with Sarah. Mother moved in with Tony and his grandparents during the summer of 2010.

On December 10, 2010, when Sarah was about two months old, she received immunizations. Sarah was upset and crying the rest of the day and overnight. Her right leg was swollen, so Mother and Tony took her to the Denton Presbyterian Hospital the next day where they were provided medicine for a possible allergic reaction to the shots. No x-rays were taken. Mother returned to the clinic with Sarah on December 13, 2010, where she was told that it was

normal for some children to experience swelling after receiving immunizations, and while it was not an allergic reaction, to continue the medication for one week.

When the swelling did not improve, Mother took Sarah back to the emergency room on December 23, 2010. After taking x-rays, it was discovered that Sarah had a fracture on her right leg. She was transported to Cook Children's Hospital for further examination. At Cook, x-rays showed that Sarah had five additional fractures—one on her right clavicle, one on her right tibia, and two on her left femur. When interviewed by a Denton police officer, Mother told him that she believed Sarah's right femur was fractured as a result of the immunizations, but she did not have an explanation for the other fractures.

Adam, Megan, and Sarah were removed from Mother and Tony on December 24, 2010, and Megan and Sarah were placed in foster care. Adam was placed with his father, Royce. After repeatedly failing drug tests for methamphetamine, Tony voluntarily relinquished his parental rights to Megan and Sarah.

After a four-day trial in December 2011, a jury found by clear and convincing evidence that Mother (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children, (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children, and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for

3

the parent to obtain the return of the children, and that termination was in the best interest of the children. The trial court appointed the Department of Family and Protective Services (DFPS) as the permanent managing conservator of Megan and Sarah, and Royce as the permanent managing conservator of Adam. Mother now appeals.

## Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

4

**Discussion**

## I. Failure to Appoint Counsel and Due Process

In her fourth issue, Mother argues that the trial court abused its discretion in failing to appoint counsel for her at the beginning of the case. To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

Section 107.013 of the family code states in relevant part:

(a) In a suit filed by a governmental entity in which termination of the parent-child relationship is requested, the court shall appoint an attorney ad litem to represent the interests of:

    (1) an indigent parent of the child who responds in opposition to the termination.

    . . . .

(c) In a suit filed by a governmental entity requesting temporary managing conservatorship of a child, the court shall appoint an attorney ad litem to represent the interests of an indigent parent of the child who responds in opposition to the suit.

(d) A parent who claims indigence under Subsection (a) must file an affidavit of indigence in accordance with Rule 145(b) of the Texas

5

> Rules of Civil Procedure before the court can conduct a hearing to determine the parent's indigence under this section.

Tex. Fam. Code Ann. § 107.013 (West Supp. 2012).

DFPS filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship on December 27, 2010. In its order for protection of a child in an emergency and notice of hearing, signed the same day the petition was filed, the trial court named DFPS as temporary sole managing conservator of the children, and ordered Mother to appear at the adversary hearing on January 6, 2011, with "all pertinent information regarding [Mother's] income, and that upon a showing of indigency and opposition to the suit affecting the parent-child relationship that a licensed attorney at law of this state[] will be appointed." Mother appeared for the adversary hearing on January 6, 2011. During the hearing, she stated that she agreed with the order and the service plan. Additionally, she did not claim indigence nor file an affidavit of indigence in accordance with Rule 145(b) of the Texas Rules of Civil Procedure.[3] *See id*. § 107.013(d). After the adversary hearing, the trial court signed a temporary order in which it deferred the appointment of an attorney for Mother.

---

[3]In her later-filed Motion for Appointment of Counsel, Mother claims that she completed an application for appointed counsel and financial affidavit prior to the January 6, 2011 adversary hearing. There is nothing on record to support her claim, nor did she alert the trial court to any application at the hearing.

A month later, on February 11, 2011, Mother filed an application for court appointed counsel and financial affidavit. She also wrote on the application, "I certify that I am [o]pposed to the termination of my parental rights." Mother's *pro bono* counsel filed a Notice of Limited Appearance on February 25, 2011, and he represented her at the hearing on the Motion for Appointment of Counsel on March 31, 2011. The trial court found that Mother was indigent and that she opposed the suit against her, and it appointed her counsel. The trial court then instructed the parties to "go back and get a date for a termination trial," and said, "If we're going to get lawyers, we might as well move right to a termination trial."

Mother argues that this statement by the trial court to "move right to a termination trial" compressed the amount of time Mother had to complete her services and prepare for trial, and "in all likelihood had a negative [e]ffect on [Mother's] case and the ultimate result." However, Mother does not demonstrate how her ability to complete her services and prepare for trial was compressed or compromised. DFPS filed its original petition on December 27, 2010. The termination trial began on December 5, 2011, and the order terminating her rights to her children was signed on December 12, 2011. The statutory dismissal deadline was January 9, 2012. *See* Tex. Fam. Code Ann. § 263.401 (requiring dismissal of the case "on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator" if trial has not commenced or an extension has not been

7

granted).[4] In between the appointment of counsel and the first day of trial, there were three permanency hearings. Mother was represented by counsel and participated in all three hearings. *See In re J.R.P.*, 55 S.W.3d 147, 150 (Tex. App.—Corpus Christi 2001, pet. denied) (holding that mother's constitutional rights were not violated by the trial court's failure to appoint counsel immediately after the filing of the original petition when mother did not request counsel at the time of the filing of the original petition, received appointed counsel immediately upon her request, and was represented through the rest of the proceedings in the trial court). In summary, there is no evidence that the case proceeded on a shorter timeline because Mother was appointed counsel, that Mother was harmed by the delay in appointing counsel for her, or that the delay in appointing counsel affected the ultimate outcome. The trial court thus did not abuse its discretion by failing to appoint counsel at the adversary hearing on January 6, 2011. We overrule Mother's fourth issue.

## II. Testimony of Trial Judge as a Witness

In Mother's fifth issue, she argues that the admission of a court order with specific negative findings towards her from the trial judge constituted testimony of the judge as a witness in violation of Texas Rule of Evidence 605. Under the Texas Rules of Evidence, "the judge presiding at the trial may not testify in that

---

[4]Mother did file a motion to retain the suit on the court's docket and set a new dismissal date, which was denied. However, Mother only moved on the ground that a parent-child bonding assessment had not been done, not on the ground that she had not had time to complete her services.

trial as a witness." Tex. R. Evid. 605. While findings of fact are not technically testimony, "orders submitted into evidence, containing findings based on pretrial evidence by the very judge presiding over the termination proceeding, could be, like a judicial comment on the weight of the evidence, a form of judicial influence no less proscribed than judicial testimony." *In re M.S.*, 115 S.W.3d 534, 538 (Tex. 2003). The supreme court "specifically prohibits judicial comments that indicate the opinion of the trial judge as to the verity or accuracy of the facts in inquiry." *Id*. In cases where the error complained of involves an evidentiary ruling, we examine the whole record to determine if the complaining party was harmed by the erroneous admission or exclusion. *Id*.

Mother challenges Petitioner's Exhibit 15. Included in the 153–page exhibit was an unredacted copy of the trial court's temporary orders from January 6, 2011. The orders included these findings:

> 3.1  Having examined and reviewed the evidence, including the sworn affidavit accompanying the petition and based upon the facts contained therein, the Court finds there is sufficient evidence to satisfy a person of ordinary prudence and caution that: (1) there was a danger to the physical health or safety of the children which was caused by an act or failure to act of the person entitled to possession and for the children to remain in the home is contrary to the welfare of the children; (2) the urgent need for protection required the immediate removal of the children and reasonable efforts consistent with the circumstances and providing for the safety of the children[] were made to eliminate or prevent the children's removal; and (3) reasonable efforts have been made to enable the children to return home, but there is a substantial risk of a continuing danger if the children are returned home.

The exhibit was admitted as business records. Mother's counsel did not object to the exhibit, but Rule 605 states that "no objection need be made in order to preserve the point." *See* Tex. R. Evid. 605. The exhibit was published to the jury while a radiologist was testifying to Sarah's injuries. There was no testimony regarding the temporary orders included in the exhibit. The temporary orders, with the trial court's findings redacted, had also been admitted into evidence earlier in the trial as Exhibit 7. These orders were used along with the Family Service Plan to show what Mother was required to do in order for her children to be returned to her permanently. This exhibit was referred to again during the State's closing argument to show how Mother had not complied with the required service plan.

The orders, which contained findings based on pretrial evidence by the same judge presiding over the termination proceeding, could be a form of judicial influence similar to a judicial comment on the weight of the evidence. *See M.S.*, 115 S.W.3d at 538 (noting that the trial judge's factual findings in a previous order should have been redacted "so that the jury could draw its own conclusions"). However, for their admission to be a reversible error, Mother must show that the error probably caused rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *M.S.*, 155 S.W.3d at 538 (noting that it was the mother's burden to show that she was prejudiced by the admitted orders).

While Mother argues that a "reasonable inference could be drawn that the jury saw the findings of [the trial judge]," she does not show how the admission of

these temporary orders probably caused the rendition of an improper judgment. The jury's findings, as discussed below, are supported by other ample evidence in the record. Further, DFPS did not point out the findings to the jury for them to consider, and it did not base any of its arguments on the findings of the trial court. *See M.S.*, 115 S.W.3d at 538; *In re P.D.A.*, No. 11-04-00189-CV, 2006 WL 726297, at *5 (Tex. App.—Eastland Mar. 23, 2006, no pet.) (mem. op.) (holding that mother failed to show that the jury reached an improper judgment based on unredacted orders containing trial court's findings when the jury's findings were supported by other evidence and the State did not base its arguments on the improperly admitted orders). After reviewing the entire record, we hold that Mother has not met her burden of showing she was prejudiced by the admission of this exhibit. *See M.S.*, 115 S.W.3d at 538. We overrule her fifth issue.

## III. Legal and Factual Sufficiency of the Evidence

### A. Grounds for Termination

In her second and third issues, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings on the grounds for termination. The trial court terminated Mother's rights based on subsections (D), (E), and (O). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O) (West Supp. 2012). In her appellate brief, Mother challenges the legal and factual sufficiency of the evidence supporting the findings that she knowingly placed or knowingly allowed the children to remain in endangering conditions or surroundings, that

she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children, but she did not challenge the findings that she failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the return of her children. The only reference to this ground for termination is in Mother's summary of the argument section of her brief where she states that she "did not fail to comply" with the court order. Mother presents no argument challenging the trial court's finding that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her children. *See id*. §§ 161.001(O), 261.001(8) (West Supp. 2012). She has thus waived this issue. *See* Tex. R. App. P. 38.1(i) (requiring an appellant's brief to contain clear and concise arguments "with appropriate citations to authorities"); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (discussing the "long-standing rule" that a point may be waived due to inadequate briefing).

Even if she had not waived this issue, there is sufficient evidence to support the trial court's finding that she failed to comply with the court order establishing the actions necessary for the return of her children. It is well settled that the family code does not provide for excuses for failure to complete court-ordered services, nor does it consider "substantial compliance" to be the same as completion. *See In re M.C.G.*, 329 S.W.3d 674, 675–76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *In re T.T.*, 228 S.W.3d 312, 319 (Tex. App.—

12

Houston [14th Dist.] 2007, pet. denied) (noting Texas courts have uniformly found substantial compliance with provisions of court orders inadequate to avoid termination findings under subsection (O)); *In re T.N.F.*, 205 S.W.3d 625, 630–31 (Tex. App.—Waco 2006, pet. denied) (emphasizing that parents must comply with every requirement of the court order and that subsection (O) does not allow for consideration of excuses for noncompliance) *overruled on other grounds by In re A.M.*, 2012 WL 3242733, at *2 (Tex. App.—Waco Aug. 9, 2012, no pet. h.); *Wilson v. State*, 116 S.W.3d 923, 929 (Tex. App.—Dallas 2003, no pet.) ("Wilson's economic argument does not create a factual dispute as to her compliance: it is, instead, in the nature of an excuse for her failure to comply."). Rather, any excuse for failing to complete a family services plan goes only to the best interest determination. *See T.N.F.*, 205 S.W.3d at 631; *see also Holley v. Adams*, 544 S.W.2d 367, 371 (Tex.1976); *In re C.M.C.*, 273 S.W.3d 862, 874–75 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding that mother's argument that she did not take a parenting class because none were available "[did] not create a factual dispute as to her compliance; rather, it is in the nature of an excuse for her failure to comply").

Orders signed by the trial court on February 11, 2011, and August 11, 2011, incorporated the service plan that DFPS had filed with the trial court on January 26, 2011, approved it, and made it an order of the court. The service plan required Mother to, among other things, complete a psychological evaluation, establish and maintain safe, stable, and appropriate housing for a

13

period of at least six months, and establish and maintain suitable employment for a period of at least six months.

Family Based Safety Services caseworker Julissa Rodriguez testified that the psychologist assigned to complete Mother's psychological evaluation could not get a hold of Mother. When Rodriguez spoke to Mother about it, Mother lied and said that the psychologist told her she was no longer working with DFPS. CPS conservatorship worker Amanda Mention testified that Mother had not established and maintained safe, stable, and appropriate housing for a period of six months. At the time of trial, Mother was living in an apartment with two roommates. She did not know either of their last names, even though she claimed to have known them for more than a year. Mention testified that CPS had concerns about her housing because it did not have enough information on who was living in the house to perform criminal history and background checks. There was testimony that Mother's brother, who has a criminal and drug use history, may live in the apartment with her. Mention also testified that Mother had not refrained from criminal conduct because Mother had been using marijuana since her DFPS case was opened.

Mother testified that at the time of trial, she had just been hired at Denton ISD to serve lunch, but had not begun working because she had to get fingerprinted. She had worked in a temporary position before that. Prior to that, she had worked at the Four Seasons, but had quit because she was "having issues with another lady" who would "always mouth talk to [her]." She also

14

admitted that she had not completed one of the classes that was required by the service plan.

The evidence established that at the time of trial Mother had not maintained stable employment or stable housing for six months and had not completed the psychological evaluation as required by her service plan. A reasonable factfinder could have formed a firm belief or conviction that Mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her children. We therefore overrule her second and third issues as to the subsection O grounds. Because, along with a best interest finding, a finding of only one ground alleged under section 161.001(1) of the family code is necessary to support a judgment of termination, we need not address the remainder of Mother's second and third issues. *See* Tex. R. App. P. 47.1; *see also In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.); *In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.).

## B. Best Interest

In her first issue, Mother challenges the legal sufficiency of the evidence that termination was in the best interest of the children. *See* Tex. Fam. Code Ann. §161.001(2).

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be

in the child's best interest.  *Id*. § 263.307(a) (West 2011).  The following factors

should be considered in evaluating the parent's willingness and ability to provide

the child with a safe environment:

(1)     the child's age and physical and mental vulnerabilities;

(2)     the frequency and nature of out-of-home placements;

(3)     the magnitude, frequency, and circumstances of the harm to the child;

(4)     whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5)     whether the child is fearful of living in or returning to the child's home;

(6)     the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7)     whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8)     whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9)     whether the perpetrator of the harm to the child is identified;

(10)   the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11)   the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12)   whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A)    minimally adequate health and nutritional care;

(B)    care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C)    guidance and supervision consistent with the child's safety;

(D)    a safe physical home environment;

(E)    protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F)    an understanding of the child's needs and capabilities; and

(13)    whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley*, 544 S.W.2d at 371–72.

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## C. The Evidence

At the time of the trial, Adam was four years old, Megan was two years old, and Sarah was fourteen months old. *See* Tex. Fam. Code Ann. § 263.307(b)(1). Adam's paternal grandmother testified that Adam was really anxious before his visitations with his Mother, and during early spring of 2011 his anxiety was so great that his pediatrician recommended that he be prescribed Zoloft. Further, she testified that Adam had told her about Tony hurting Mother in the summer of 2010, and told her that Tony choked Mother and made her cry.

Sarah and Megan have been with the same foster family since April 1, 2011. *See id.* § 263.307(b)(2). Since that same time, Adam has lived with his father, Royce. Prior to living with his father, Adam had been living with Mother's

mother. Mother testified that she did not know how long Adam had been staying fulltime with her mother, but later she testified that it had been since the summer of 2010. Mother did not tell Royce that Adam was not living with her, but would have her mother bring Adam to Mother's house on days when Royce would pick him up for visitation.

Sarah's x-rays revealed that she had suffered six fractures to her body. *See id*. § 263.307(b)(3). Daniel Oshman, a pediatric radiologist, testified that these types of fractures are the result of "significant trauma." He described a fracture to the right femur, the left femur (which he explained as "the lining of this bone has been stripped off as well with some sort of twisting or grasping type injury typically that pulls the fibrous lining, the thick lining of the bone off of the bone and causes it to bleed underneath"), the right forearm, and the right clavicle. Sarah's metaphyseal fracture is of the type "almost always seen with non-accidental trauma and often are seen with children who were shaken." He said that forearm injuries like Sarah's "usually occur[] from a direct blow" not by grasping or twisting the baby.

Oshman testified that the leg fractures would cause pain to the child every time she moved. He estimated that the fractures were about two to three weeks old at the time they were x-rayed. He said, "It's . . . the fact that . . . these injuries have obviously been there a long time and this is the first time we're seeing the child to get x-rays is worrisome in that . . . you know, that this has been going on for a while." He believed the fractures were the result of child abuse.

19

Sophia Grant, a CARE team pediatrician at Cook Children's Hospital also testified that Sarah's injuries at her young age were "extremely concerning" for child abuse. She believed that an adult would be aware that the child was in pain when the fractures occurred.

There was no evidence that the other children had been physically harmed, but Royce testified that Mother once dropped Adam on the couch when he was a baby in order to attack Royce in a fit of jealousy. There was also testimony that Mother would speak inappropriately to the children. Royce testified that at one visitation, Mother told Adam to get away from her because she was angry with DFPS over something else. *See id*. § 263.307(b)(4). At another visit, he asked her for a toy and she told him she did not bring him one because he was sick and did not show up for the last visit. Mother testified that she never spanked her children, but Tony testified that that was "not true." Tony said that he had once seen Mother spank Adam too hard.

Mother's counselor, Mark Dittloff, testified that Mother has post-traumatic stress disorder (PTSD) as a result of her abusive childhood. *See id*. § 263.307(b)(6). He explained that Mother's "ability to regulate her fear has been compromised, either damaged or destroyed." Dittloff testified that PTSD "can affect parenting in a variety of different ways. Some parents may simply withdraw from their children. Some may become explosive. . . . [S]ome may turn to drugs and alcohol. Some may continue to be very effective parents." Dittloff testified that it is difficult to predict how long it will take someone to work through

their PTSD and that although Mother has improved since seeing him, he could not testify when Mother will be well. He believed it would require months or even years of more therapy.

Mark Foster, a psychologist, also evaluated Mother. He rated her IQ as "in the low average range" and said that her reading ability was at a fourth-grade level, her sentence comprehension was at a sixth-grade level, and her math skills were at an eighth-grade level. Foster disagreed with Dittloff's PTSD diagnosis. He noted no "hypervigilance" or anxiety. He described Mother as being "reasonably truthful" in her evaluation but noted, "There were times when she was rather vague and evasive in answering questions, and I have some concerns there about that." He noted that Mother distorted information to downplay her shortcomings.

Foster testified that her test results indicated that she is likely to have problems managing her emotions, especially anger. He explained that "it's fairly common for people with this particular profile to very often have some run-in with the legal system, whether that be civil or criminal," and that they "typically have difficulty learning from their experience." He also said that Mother "viewed herself as an exceptionally good parent," which he said was "remarkable."

Foster said that Mother likely has romantic relationships that are "fairly brief and . . . rather stormy." Because of those rocky relationships, her children could "have problems with developing a sense of security." The children's ability to feel safe and protected would "certainly [be] impair[ed]".

21

Mother and Tony have a history of domestic violence.  *See id*. § 263.307(b)(7).  When asked how many times Tony has assaulted her, Mother said "a lot" and "too many."  When asked if she recalled telling Denton County Friends of the Family that Tony had beat her up in a car with Adam while she was pregnant with Megan, she answered, "I think so."  She also told Friends of the Family that Tony pushed her while she was pregnant with Sarah and later choked her.  She claims that Tony gave her a black eye in June or August 2010, and that he choked her until she was unconscious on December 15, 2010.

Tony denied ever hitting Mother when she was pregnant with Megan, but admitted that he had "grabbed her and put her up against . . . a car."  He also denied giving Mother a black eye, but said that Mother did have a black eye in December 2010, and that Mother would not tell him where it came from.  Tony admitted to using marijuana and methamphetamine.  *See id*. § 263.307(b)(8).  Tony testified that he had used marijuana with Mother one or two months after the children had been removed, but he did not believe she used marijuana regularly.

Almost a year after Sarah's injuries were discovered, the perpetrator is still unknown.  *See id*. § 263.307(b)(9).  Dittloff testified that Mother believes that Tony was the perpetrator.  At trial Mother testified that Tony could have injured Sarah but that she did not know for sure.

John Burgess, a special investigator for DFPS testified that Tony's grandmother told him that she had seen Mother throw Sarah into a playpen.

Tony testified that he does not know who hurt Sarah. Officer Scott Salazar of the Denton Police Department testified that Mother was the primary suspect in Sarah's case.

Leah McMaster, the CPS investigator who was present when Sarah was taken to the hospital, testified that she had difficulty getting information from Mother. *See id*. § 263.307(b)(10). When McMaster asked Mother how many children she had, Mother first told her she only had two. McMaster looked into Mother's CPS record and discovered that Mother also had Adam. She confronted Mother. Mother told McMaster that she did not know who Adam's father was, and when McMaster told her that Royce's name was in the CPS file, Mother claimed that Royce was involved in Adam's life but that she did not have any contact information for him. Mother also told McMaster that she did not know her mother's contact information. McMaster had to again tell Mother that it was important to get in contact with Mother's mother, and Mother then dialed Mother's phone number from memory.

CASA supervisor Kristen James noted that Mother had not really initiated services before she was incarcerated, but Mother had told James that she wanted to work the services to get her children back. Officer Salazar described Mother as evasive when he interviewed her regarding Sarah's injuries. Thomas Kelly, the guardian ad litem for the children, testified that both Mother and Tony continually denied being in a relationship with each other, which he knew was not true.

Rodriguez testified that it was important for Mother to complete a psychological evaluation, but the psychologist could not reach Mother, despite repeated attempts to schedule the evaluation. When Rodriguez approached Mother about the evaluation, Mother lied and said that she had talked to the psychologist, but the psychologist told her she was no longer working with DFPS. Rodriguez said that a parent who is not honest with DFPS cannot be very successful in completing her services.

Despite being told that her relationship with Tony was inappropriate, or even harmful to the children, Mother continued to see Tony up until the weeks before the trial. *See id*. § 263.307(b)(11). Rodriguez testified that she never contacted Tony because Mother told her that she was not in contact with him. Mother also told Rodriguez that she did not have Tony's contact information. When she became pregnant with Sarah, she implied to Rodriguez that it was by another man. Rodriguez said that if she had known the truth about Mother's relationship with Tony, she would not have closed her case as successfully completed.

Mother delayed in starting many of her services, and even when Mention rescheduled her visitations with Adam so that Mother could attend a healthy relationships class, Mother still did not attend the class. However, Michelle Fox, a counselor at Denton County Friends of the Family, testified that Mother completed nine group sessions, even though she was only required to do four.

Rodriguez testified that she had no concerns regarding Mother's parenting skills. However, Mention testified that Mother's parenting skills "could be adequate," but that she had "great concerns" after watching Mother's visitations with the children. *See id*. § 263.307(b)(12). She described Mother's behavior towards Sarah during visits as "very non-loving." Kristen James, a CASA supervisor, described Mother's first visits with her children as "pretty disturbing." James testified that Mother did not show any bond with Sarah, explaining that Mother would not look Sarah in the eyes and would hand Sarah over at the end of the visit without saying goodbye. James recalled one visit in the winter in which Mother left Sarah in a snowsuit buckled into her car seat for most of the visit, despite the room being very warm, until James suggested she take Sarah out of the snowsuit. James also testified that Mother's visits improved over time and that Mother became more loving towards Sarah.

Mention testified that at visits, Mother would often not change Megan's diapers, even when Megan would tell Mother that she had gone to the bathroom. *See id*. § 263.307(b)(12)(A). Mention even commented on the smell to Mother, and Mother would still not attempt to change Megan's diaper. Tony testified that Mother did not like to change the babies' diapers at home and that he often had to change them because she did not want to do it herself. He also said that Mother was uncomfortable bathing the children.

Royce also testified that when Adam was a baby, he would often have diaper rash because he had often been sitting in a dirty diaper while in Mother's

25

care. He said that sometimes when he got Adam, he was wearing old or dirty clothes and Royce would have to buy more clothes for him.

There was testimony that Mother has not shown guidance and supervision consistent with the children's safety. *See id*. § 263.307(b)(12)(C). Mention testified that at one visit, Adam was dangerously climbing on a high chair and neither Mother nor her mother attempted to stop him or help him despite it being a safety hazard. Mention described "several different visits" in which Adam would try to get Mother's attention by "constantly call[ing] her name," and Mother would ignore him, which Mention felt was an inappropriate response. *See id*. § 263.307(b)(12)(B).

She also described a visit in which Megan pulled a box cutter out of Mother's purse. Mother told Megan not to play with it but she did not take the box cutter away from Megan. Megan would also take medicines out of Mother's purse, and if Mother took them away, she would not place them out of Megan's reach. Mention testified that at another visit, Megan found Mother's inhaler and Mother was not watching her. Other people had to step in to prevent Megan from putting the inhaler in her mouth. Sarah would also walk around with things in her mouth and Mother would not stop her. Mention testified that she had to tell Mother to take the small toys out of Sarah's mouth because they were a choking hazard. At other visits, Sarah would pull toys off the shelf, making a loud crash, and Mother would not look over to make sure Sarah was not harmed.

Mention testified that she believed it was endangering to Adam for Mother to let him live with her mother, knowing that Mother's mother allowed Mother's father to abuse her for many years and did nothing to protect her. *See id*. § 263.307(b)(12)(D). Mother said she believes her mother has good parenting skills, and although she acknowledged that her mother physically and emotionally abused her growing up, she wrote it off as her mother being "frustrated" with Mother's alcoholic father.

Mention also expressed concern for Mother's ability to provide a safe home environment if she is having the panic attacks, anxiety, and paranoia from which she claims she suffers. Mention did not think Mother adequately screened inappropriate people from her children. Tony testified that he believed that Mother's brother lives in the apartment with Mother and her roommates, and that he saw signs of drug use in the house "a couple of months ago." Royce testified that he has concerns about the type of people Mother allows into her home. He said, "[I]t's never been the greatest crowd of people," and he described being attacked by Mother's brother with a knife. Rodriguez, the Family Based Safety Services caseworker, testified that twice she had gone to Mother's apartment and Mother's brother or her mother's roommate answered the door and Mother was not home.

Foster testified that he has "strong concerns" that Mother could be a protective parent. *See id*. § 263.307(b)(12)(E). Mention expressed concern that Mother continues to have a relationship with Tony because of their extensive

27

history of violence and because Tony continues to use methamphetamine. Mother admitted to lying to DFPS about her relationship with Tony. Mention explained that children can often be injured during incidences of domestic violence. When Mother was asked if she thought fighting in front of the children was endangering, she answered, "I guess, yes."

Mother testified about one fight with Tony that occurred in front of the children in December 2009. She first testified that the children were not in the room, but later explained that they had been in the room and her mother's roommate had removed them when she saw it was getting violent. Mother admitted that she had told the CPS investigator a few days later that she was not going to allow Tony around the children anymore. Royce's grandmother testified that Adam would tell her and Royce about altercations between Mother and Tony. He would describe "[Tony] hurting mommy and mommy crying and mommy and [Tony] fighting. And he was very -- it was always the same scenario, and he was very specific about [Tony] choking mommy or mommy crying."

Mother testified that if the children were returned, she would get a restraining order against Tony. Mother admitted that she had previous opportunities to get a protective order against Tony but that she never did. She also testified that she moved into Tony's house in 2010 with him and his grandparents even though she was scared of him and his grandmother would threaten her. But later she admitted that she moved in because she was still in a relationship with him. Mother testified that she had reported to the police that

28

Tony was stalking her, but when asked about the reports, she could not provide any information about when she had made the reports or how many she had made. She was asked if she ever told anyone at Friends of the Family that she was being stalked, and she replied, "I think. I don't know." Mention testified that CPS told Mother her continued relationship with Tony was inappropriate because of the violence between them, but Mother continued to see Tony.

Mother testified that if she knew for sure that Tony had injured Sarah, she would leave him for good. But she could not say what it would take for her to know for certain. She also said that Tony had told her that he would go to jail at the end of this case, and when she asked him if he had injured Sarah, he would refuse to talk about it.

Mention testified that Mother has never expressed concern over Sarah's injuries to her. The guardian ad litem testified that he was concerned that neither Mother nor Tony seemed concerned that they did not know who injured Sarah.

Foster testified that Mother's "expectations of what constitutes age-appropriate behavior may be rather unrealistic." *See id.* § 263.307(b)(12)(F). Mention testified that Mother does not have an adequate social support system. *See id.* § 263.307(b)(13). Mother's counselor Dittloff agreed. Mother testified that she could take the children to North Carolina where she has family. However, she did not seem to realize that meant that Adam would not be able to see his father. Mention testified that Mother had never told her of a plan to move to North Carolina and that Mother had said she had not talked to those family

members "in several, several years, and it seems unrealistic to think that that can actually occur."

Megan and Sarah are too young to express their desires, but Royce's grandmother testified that Adam did not like living with Mother's mother because he was afraid of her roommate. *See Holley*, 544 S.W.2d at 371–72. Royce's grandmother testified that Adam "never says that he misses his mom," but that he does talk about protecting his little sisters. She said that Adam "talks a lot about mommy not being there or mommy missing." Royce also testified that he has never heard Adam say that he misses his mother.

Megan and Sarah's foster mother testified that Megan would defecate right before visits with her mother repeatedly for two and a half months, which the foster mother interpreted as signs of anxiety. She said that Megan would often need to be comforted after visitation.

Leah McMaster, a CPS investigator who investigated Mother and Tony the night Sarah was taken to the hospital, described Mother as being detached from Sarah, showing no "affection or concern" for Sarah. When Sarah's blanket fell off at the hospital, Mother did not move to put it back on her. McMaster interviewed Tony's mother and grandmother, who both said that Mother "was rough with the children and not very affectionate, didn't seem to want to be there with the children very much." Tony's grandmother told McMaster that she saw Mother throw Sarah into her crib. McMaster testified that if Mother did have PTSD, she

30

would be concerned about her ability "relating to real world events" or having an emotional attachment to her children.

Detective Eric Beckwith, who interviewed Mother and Tony at the hospital, testified that Mother never called Sarah by her name during the interview, but referred to her as "it." Beckwith said that it was very unusual. Officer Salazar also testified that Mother would not refer to Sarah by her name during his interview.

Royce testified that Mother would withhold Adam from visitation when she was angry with Royce. He said that he did not see Adam for almost a year because Mother would not return his phone calls. He eventually had to file for court-ordered visitation. He described Mother as manipulative and "a very smart woman. She knows what she's doing." Mother admitted that she had been having difficulty managing her own day-to-day life but argued that it is because of her PTSD.

Adam is living with his father Royce and Royce's grandparents. Royce's grandmother testified that Adam is thriving in her home and described Adam as a "very smart little boy" who loves going to pre-kindergarten. She said that Royce is a good father who tries very hard. Royce testified that he would like Adam to continue to see his sisters because Adam loves them. DFPS plans for Adam to continue to live with his father.

The foster home in which the girls are placed has expressed interest in adopting both girls. *See id*. At the time of trial, the girls had been in the same

foster home for about nine months. The guardian ad litem testified that he was "amazed" at how well the girls were doing in their foster home and that they were "developing well." Mention testified that DFPS has no concerns about the parenting abilities of the foster family. The foster mother described her experience with the girls as "[w]onderful. Joyous. Exciting. It's one of my dreams. It's been absolutely wonderful." She says the girls call her and her husband Mom and Dad and Megan tells them she loves them "all the time." She also testified that she would like for them to continue to have a relationship with their brother.

CASA supervisor James testified that the foster home that the girls are in is a "great placement." She also testified that she could not visit Mother's home because Mother could not give her "an address of where she was living exactly."

Royce is currently living with his grandparents while he attends college, but he is planning on moving into his own place with Adam when he graduates with a degree in mechanical engineering. The guardian ad litem testified that he thought Royce was "quite acceptable" in his ability to care for Adam and his choice in the daycare in which he had enrolled Adam.

The guardian ad litem recommended that Mother's rights be terminated for a number of reasons. He testified,

> Well, first of all, the big concern is we don't know who hurt that baby. It's possible anybody did it. But to me and to CASA, that's an unsafe environment to be putting that baby back in because you don't know if someone—if the baby could be hurt again.

32

We're also concerned about the support for the children. How are they going to be supported?

We're also concerned about the support structure for the parents. Where are they going to go for help? Who is going to do the daycare? Are they both—are—whoever gets them, are they going to get a job and keep that job for more than a few weeks and quit?

So those—those are the big issues. There's a bunch of them. Safety is—is a key issue obviously, the ability to support and maintain a proper environment, safe environment for the child.

Royce testified that he believed Mother's parental rights should be terminated because he does not believe that the children are safe in her care.

Considering the relevant statutory factors in evaluating Mother's history of domestic violence, the magnitude of Sarah's injuries and the lack of resolution in finding the perpetrator, Mother's dishonesty with police and DFPS agents, her inability to effect positive environmental and personal changes, her inability to provide a safe home and protect the children from exposure to violence, and the other relevant statutory and *Holley* factors, we hold that, in light of the entire record, and giving due consideration to evidence that the jury could have reasonably found to be clear and convincing, the jury could reasonably have formed a firm belief or conviction that termination of Mother's parental rights to the children was in the children's best interests. Accordingly, the evidence is legally and factually sufficient to support the jury's family code section 161.001(2) best interest finding. We overrule Mother's first issue.

**Conclusion**

Having overruled Mother's issues on appeal, we affirm the judgment of the trial court.

LEE GABRIEL
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GABRIEL, JJ.

DELIVERED:  September 27, 2012